TRACY WILKISON
Attorney for the United States, Acting Under
Authority Conferred by 28 U.S.C. § 515
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
KERRY L. QUINN (Cal. Bar No. 302954)
Assistant United States Attorney
Major Frauds Section
TERRENCE P. MANN (Cal. Bar No. 211377)
Assistant United States Attorney
Santa Ana Branch Office
    United States Courthouse, 411 West 4th Street
    Santa Ana, California 92701
    Telephone: (213) 894-5423 / (714) 338-3536
    Facsimile: (213) 894-6269 / (714) 338-3708
    E-mail:    Kerry.L.Quinn@usdoj.gov
               Terrence.Mann@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | SA CR No. 13-001(B)-2-AG |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION |
| v. | |
| MAHER OBAGI, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel
of record, the United States Attorney for the Central District of
California and Assistant United States Attorneys Kerry L. Quinn and
Terrence P. Mann, hereby files its sentencing position.

//
//
//

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 30, 2018          Respectfully submitted,

TRACY WILKISON
Attorney for the United States

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


                          _____/s/_____
                          KERRY L. QUINN
                          TERRENCE P. MANN
                          Assistant United States Attorneys

                          Attorneys for Plaintiff
                          UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

On March 27, 2015, a jury convicted defendant MAHER OBAGI ("defendant") of one count of conspiracy in violation of 18 U.S.C. § 1349 and three counts of wire fraud in violation of 18 U.S.C. § 1343.  The jury hung on three additional wire fraud counts, which the government has reserved the right to retry.  On January 29, 2018, the United States Probation Office ("USPO") filed a Presentence Report [docket no. 468, the "PSR"] and a disclosed recommendation letter [docket no. 467, the "letter"].  In the PSR and letter, the USPO calculated a recommended guideline range of 121 to 151 months, and recommended a custodial sentence of 97 months and four years of supervised release.  The government concurs in the USPO's guideline calculation, resulting in a guideline range of 121 to 151 months, but the government respectfully recommends a sentence at the low-end of that range, or 121 months custody.  The government concurs in the USPO's other sentencing recommendations, namely a four-year term of supervised release, a $400 special assessment, and a restitution order for $10,047,272.

## II.   STATEMENT OF FACTS

From approximately November 2007 to approximately July 2009, defendant and others participated in a scheme to defraud mortgage lenders by inducing them to fund loans based on the submission of false information, including inflated purchase prices, fake down payments, and false information about the borrowers' employment, income, and assets.  Defendant was convicted along with co-defendant Mohammed Salah ("Salah") of conspiracy to commit bank fraud and wire fraud in relation to this scheme, and defendant was separately

convicted of additional wire fraud counts.  On February 5, 2016, following a severed jury trial related to the same scheme, defendant's older brother Aref Abaji ("Abaji") was convicted of similar crimes related to this scheme.  (PSR ¶ 5.)  Three other co-conspirators - Ali Khatib ("Khatib"), Jacqueline Burchell ("Burchell") and Mohamed El Tahir ("El Tahir") - pled guilty to related crimes and agreed to cooperate with the government.  (PSR ¶¶ 7-9.)  Charges against El Tahir were dismissed in 2016 after he was killed in an unrelated incident.  (PSR ¶ 9.)  Defendant Wajieh Tbakhi ("Tbakhi") was charged with related crimes but is a fugitive.

The Conspiracy

The scheme operated substantially the same from 2007 to 2009:

Defendant and his co-conspirators would identify newly-built, multi-unit condominium properties, including properties located in Florida, California, and Arizona, in which the sellers were struggling to sell the properties, and the co-conspirators would make arrangements to broker the sale of these properties in exchange for a large undisclosed kickback, often misleadingly called a "commission" or a "marketing fee" in agreements with sellers.  (PSR ¶¶ 16, 20.)

Through the scheme, the co-conspirators would purchase, and cause the purchase of, condominium units for themselves, their close relatives, and individuals with good credit scores who were recruited to serve as purchasers (collectively, "straw buyers"); in total, the co-conspirators purchased or caused the purchase of more than 100 condominium units at inflated prices.  (PSR ¶ 21.)

The co-conspirators would recruit straw buyers by presenting the purchase of the condominium units as an investment opportunity that did not require any money down or any mortgage payments for a

specified time period, and by promising the straw buyers that the co-conspirators would manage the condominium units for them, renting them out, and using the rental income to make mortgage payments on the straw buyers' behalf.  (PSR ¶ 22.)  The benefit to the straw buyer was an upfront payment that they received, as well as possible profits when the properties were resold in the future.  (PSR ¶ 22.)

The co-conspirators would further identify mortgage lenders, including federally chartered and insured depository institutions, to fund mortgage loans for the purchase of the condominium units in the straw buyers' names, and would prepare and submit loan applications on the straw buyers' behalf.  (PSR ¶ 23.)

The co-conspirators would include materially false and misleading information in the loan applications about the straw buyers' employment, income, assets, liabilities, and ability to make a down payment toward the purchase of the properties.  (PSR ¶ 24.)  The co-conspirators would falsely represent to the mortgage lenders that the straw buyers had made significant down payments toward the purchase of the properties when in fact the straw buyers had contributed nothing toward the purchase and in many cases received money from the transaction.  (PSR ¶ 26.)

The co-conspirators would simultaneously submit loan applications to different mortgage lenders for the purchase of multiple properties in the name of the same straw buyers, concealing from each mortgage lender the straw buyer's multiple loan applications and liabilities.  (PSR ¶ 27.)

Defendant and his brother and co-defendant Abaji would direct defendant Salah and others to create fraudulent documents, including

fabricated and altered W-2 forms, pay stubs, and bank statements, to support the false information in loan applications. (PSR ¶ 25, 28.)

Defendant, along with co-defendant El Tahir, also took steps to make it appear that fictitious companies were real businesses so that they and other co-conspirators could list these fictitious companies on loan applications as sham employers for the straw borrowers. (PSR ¶ 29.) Similarly, defendant El Tahir would purchase prepaid cell phones to have numbers to list for the sham companies on loan applications. (PSR ¶ 30.) Defendant, along with other co-conspirators, would answer those cell phones and pretend to be employer representatives when mortgage lenders would call to verify employment information. (PSR ¶ 30.)

Defendant and other co-conspirators would conceal from lenders large, secret kickbacks - misleadingly called "marketing fees" and "commissions" in contracts with some sellers – where sellers paid the kickbacks to the defendants and their co-conspirators in connection with the purchase of the properties, payments that had the net effect of lowering the purchase price of the properties from the amount represented to mortgage lenders. (PSR ¶¶ 31, 32.)

Defendant Burchell, the escrow officer, facilitated the scheme by creating two versions of HUD-1s (or closing statements) provided to the mortgage lenders. The false HUD-1s, labeled "estimated," would conceal from the mortgage lenders the significant kickbacks that builders were paying to the defendants. (PSR ¶ 33.) In many of the transactions, the kickbacks totaled $50,000 to $100,000, or more, on properties whose list price was less than $300,000. (PSR ¶ 33.)

Defendant Burchell would provide the false or "estimated" HUD-1s to the mortgage lenders in advance of and at closing. Immediately

4

after the deal closed, or as it was preparing to close, defendant Burchell would alter the false or "estimated" HUD-1s to create accurate, "final" HUD-1s, which she maintained in her files, but did not disclose to the mortgage lenders.  If the mortgage lenders asked for the "final" HUD-1, defendant Burchell ignored the requests.  (PSR ¶ 34.)

At the beginning of the scheme, defendant instructed defendant Burchell not to let the lenders know about the kickbacks that the builders were paying to the co-conspirators.  (PSR ¶ 35.)  For most of the properties, defendant Burchell would provide the co-conspirators a significant portion of the funded loan amount directly out of escrow.  Once the deal closed, they would divide the proceeds, paying themselves, making some mortgage payments, and making payments to the straw buyers. (PSR ¶ 35.)

Beginning in at least September 2007, defendant began receiving payments from various entities representing profits received from the fraudulent loans and builder kickbacks.  The payments continued until at least September 2009 and totaled at least $588,598.  (PSR ¶ 36.)  The government introduced evidence at trial, including bank records summarized in Exhibits 8, 9 and 13, showing that defendant received $254,530 on kickbacks from the property purchases made in his name and that he and his brother (through defendant's bank accounts) received $892,111 in fraudulent proceeds from the scheme, with checks written to defendant and/or his relatives from Excel bank account dating back to the beginning of the scheme in June 2007 through the end in July 2009.

<u>Florida Properties</u>

In furtherance of the conspiracy, defendant and his co-conspirators committed the following overt acts involving a condominium developments in Florida.

In order to test the profitability of the scheme, in approximately July 2007, defendants Khatib and Abaji negotiated the purchase of a property located at in Fort Meyers, Florida.  (PSR ¶ 38.)  Defendant signed the purchase agreement and mortgage loan application for this test property.  (PSR ¶ 38.)

In November and December 2007, defendant's brother, co-defendant Abaji, negotiated a "marketing agreement" with the builder of a development in Kissimmee, Florida (the "Kissimmee builder"), whereby the Kissimmee builder agreed to pay the co-conspirators a kickback (misleadingly termed a "marketing" fee) of approximately $88,000 per unit sold. (PSR ¶ 39.)

On December 21, 2007, defendant Abaji received an email from a representative of the Kissimmee builder, which stated that the Kissimmee builder would make "marketing" payments to defendant at the close of each property sale.  (PSR ¶ 39.)

On January 11, 2008, defendant Tbaki provided straw buyer D.H. with a Washington Mutual Bank official check in the amount of $35,934.19, which D.H. deposited into D.H.'s Wells Fargo Bank account number XXXX4487.  (PSR ¶ 41.)

On January 15, 2008, at defendant Tbaki's direction, D.H. wired $35,934.19 from D.H.'s Wells Fargo Bank account number XXXX4487 to a title company, with the notation, "Purchase down payment," relating to the purchase of property at XX87 Town Terrace North from the Kissimmee builder.  (PSR ¶ 42.)

6

California Properties

In furtherance of the conspiracy, defendant and the co-conspirators committed the following overt acts involving a development in Antelope, California.

In August 2008, defendant Abaji negotiated an agreement with the builder of a condominium development at XX34 Walerga Road in Antelope, California (the "Antelope builder"), whereby the Antelope builder agreed to pay the co-conspirators a kickback (misleadingly termed a "credit") of approximately $84,000 to $90,000 per unit sold. (PSR ¶ 43.)

On September 10, 2008, defendant signed a loan application to lender Greenlight Financial Services related to the purchase of condominium Unit 128 from the Antelope builder, where the loan application contained false information about defendant's income, assets, and liabilities. (PSR ¶ 44.)

On September 11, 2008, defendant Burchell prepared a HUD-1, marked "Estimated," which related to defendant's purchase of condominium Unit 128 from the Antelope builder. This "Estimated" HUD-1, which was submitted to mortgage lender Greenlight Financial Services, falsely reflected a down payment of approximately $46,280 from Obagi as the borrower, and falsely reflected no cash paid to the borrower and no "credit from seller to buyer." (PSR ¶ 45.)

On September 12, 2008, defendant Burchell prepared a HUD-1, marked "Final," which related to defendant's purchase of condominium Unit 128 from the Antelope developer. This "Final" HUD-1, which was not submitted to mortgage lender Greenlight Financial Services but was maintained in defendant Burchell's files, reflected no down payment from defendant as the borrower, reflected cash paid to Obagi

1  of approximately $37,591, and reflected a "credit from seller to

2  buyer" of $84,000.  (PSR ¶ 46.)

3        On September 12, 2008, defendant caused, or aided in the

4  transmission of, a wire transfer via a Fedwire server located in New

5  Jersey of $155,083 from Greenlight Financial Services' Texas Capital

6  Bank account to California Counties Title Co. Professional Business

7  Bank account, number XXXX9119, in Pasadena, California, to fund

8  defendant's purchase of XX34 Walerga Road, Unit 128, in Antelope,

9  California (this wire transfer is charged in Count 2 of the FSI).

10  (PSR ¶ 47.)

11        To assist in the distribution of the scheme funds, on November

12  5, 2008, defendant Salah deposited Event Marketing, LLC check number

13  10260, in the amount of $20,000, into his Washington Mutual/Chase

14  Bank account number XXXX4698.  On the same date, defendant Salah

15  purchased Washington Mutual official check number 2342405821, in the

16  amount of $20,000, from his Washington Mutual/Chase Bank account

17  number XXXX4698. (PSR ¶ 48.)

18        On February 6, 2009, defendant Salah's Washington Mutual/Chase

19  Bank statement for the month of December 2008, account number

20  XXXX4698, was submitted to mortgage lender Bank of America in support

21  of straw buyer R.D.'s loan application for the purchase of

22  condominium Unit 531 from the Antelope builder.  Defendant Salah's

23  account statement was altered to reflect that R.D. was the account

24  owner and to increase the true account balance from approximately

25  $433 to approximately $84,388.  (PSR ¶ 49.)

26        On March 16, 2009, defendant caused, or aided in the

27  transmission of, a wire transfer via a Fedwire server located in New

28  Jersey of $161,978 from HSBC Mortgage Corp.'s HSBC Bank account,

8

number xxxx1584, in Depew, New York, to EscrowQuick's Comerica Bank account, number XXXX8933, in El Segundo, California, to fund borrower R.D.'s purchase of XX34 Walerga Road, Unit 825, in Antelope, California (this wire transfer is charged in Count 6 of the FSI). (PSR ¶ 50.)

Arizona Properties

In furtherance of the conspiracy, defendant and the co-conspirators committed the following overt acts involving developments in Phoenix, Arizona.

In June 2009, defendant Tbakhi's Wells Fargo Bank statement for the month of April 2009, account number XXXX5903, was submitted to mortgage lender Wells Fargo Home Mortgage in support of straw buyer A.E.'s loan application for the purchase of property at XX30 East Lakewood Parkway, Unit 1092, in Phoenix, Arizona.  Defendant Tbakhi's bank statement was altered to falsely reflect that A.E. was the account owner.  (PSR ¶ 51.)

On July 10, 2009, defendant El Tahir's Washington Mutual/Chase Bank statement for the month of May 2009, account number XXXX7399, was submitted to mortgage lender Bank of America in support of straw buyer J.S.'s loan application for the purchase of property at xxx13 South Desert Foothills Parkway, Unit 1116, in Phoenix, Arizona. Defendant El Tahir's account statement was altered to falsely reflect that J.S. was the account owner and to increase the true account balance from approximately $1,827 to approximately $96,221.  (PSR ¶ 52.)

On July 15, 2009, defendant caused, or aided in the transmission of, a wire transfer via a Fedwire server located in New Jersey of $218,879 from Bank of America's Brea Loan Line Funding account,

number XXXX7447, in Charlotte, North Carolina, to EscrowQuick's
Comerica Bank account, number XXXX8933, in El Segundo, California, to
fund borrower J.S.'s purchase of xxx13 S. Desert Foothills Parkway,
Unit 1116, in Phoenix, Arizona (this wire transfer is charged in
Count 7 of the FSI).  (PSR ¶ 53.)

Losses

Defendant and his co-conspirators purchased, or caused the
purchase of, at least 100 properties through the scheme, with twelve
mortgage lenders and secondary mortgage purchasers ("victims")
suffering $10,047,272 in losses as a result of the scheme.  (PSR
¶¶ 54, 55.)

Victim Impact

One of the victims submitted a victim impact statement, stating
that the fraud scheme that defendant committed and other similar
schemes were devastating to the company and the mortgage industry.
The lender further stated that because of the type of fraud scheme in
which defendant engaged, mortgage lenders have been compelled to add
many additional layers of audits and re-verifications of the mortgage
loan process, making it more difficult and time consuming for
consumers to obtain home loans. (PSR ¶ 57.)

**III.  ARGUMENT**

"Sentencing proceedings are to begin by determining the
applicable Guidelines range." United States v. Carty, 520 F.3d 984,
991 (9th Cir. 2008) (en banc).  The range is "the starting point and
the initial benchmark." Id.  However, it is also well established
that "every judge is at liberty to vary from that range." United
States v. Mitchell, 624 F.3d 1023, 1030 (9th Cir. 2010).  Thus, the
Court has discretion under United States v. Booker, 543 U.S. 220

10

(2005), and <u>Kimbrough v. United States</u>, 552 U.S. 85 (2007), to sentence outside of the guideline range.

A guideline sentence is appropriate in this case.  As set forth in the PSR, the guideline range for this case is 121 to 151 months. A sentence at the low end of the guideline range, or 121 months, is sufficient but not greater than necessary to achieve the sentencing goals of 18 U.S.C. § 3553(a).

First, the crimes that defendants committed are serious. Defendant was a key participant in a massive fraud scheme that caused more than $10 million in losses to more than ten different mortgage lenders.  Defendant was a supervisor and manager in this scheme, and directed others, including defendants Burchell, El Tahir, and Salah, in how to carry out different parts of the fraud.  The fraud scheme preyed upon a vulnerable mortgage industry in a time where the housing market was already reeling from the 2008 financial crisis. This type of scheme, called a builder-bailout scheme, prolonged and worsened the housing crisis in 2009 and 2010 by keeping housing prices artificially inflated after the start of the market downturn, and then deepening losses that mortgage lenders suffered when condo units needed to be sold at a fraction of loan amounts outstanding on loans issued on inflated purchase prices.  Meanwhile, as the economy was in a tailspin, defendant and his co-conspirators made millions of dollars from fraudulent mortgage loans, without putting any of their own money down and using straw borrower's names and credit.  In this way, defendant made money without investing anything of his own or putting his own credit at risk.

Many of the straw borrowers were not so lucky.  The Court heard testimony (at both defendant's trial and his brother's trial) from

11

several straw buyers whose identities were used in the conspiracy, including elderly individuals such as R.D. and D.H., who testified about how they were brought into the scheme.  Defendant's brother, co-defendant Abaji, recruited R.D., taking advantage of an old family friend and putting him into fraudulent investments, which has resulted in R.D. suffering significant financial losses as he has struggled to make payments on inflated loans that were taken out in his name.  The Court may also recall the testimony of D.H., an elderly woman who worked as a secretary in a mobile home park where she lived.  She testified that she did not understand the investment and did not understand that she was being asked to purchase properties in her name, and after the loans went into default, her credit was ruined.

Second, a substantial sentence is needed for deterrent purposes and to promote respect for the law.  As the USPO noted in the PSR, this is not a victimless crime, and defendants' criminal conduct "should be met with substantial sentencing as a deterrent to others who might repeat their behavior."  (PSR ¶ 57.)  The co-conspirators made millions of dollars from the fraud, and caused losses of more than $10 million.  Defendant himself profited handsomely; he received $254,530 on kickbacks from property purchases in his name, and he and his brother (through defendant's bank accounts) received $892,111 in fraud proceeds.  Defendant may never be able to pay all of this money back, as it has been spent or disbursed to the point of being untraceable, and in this situation, a prison sentence is the only way to send a deterrent message to defendant.  Further, a substantial prison sentence will send a message to would-be criminals in this district who view white collar crime as under-prosecuted and under-

1  punished, and who think that they can steal millions and that, even
2  if they are caught, they will walk away with only a slap on the
3  wrist.

4       Third, the history and characteristics of the defendant warrant
5  a substantial prison term.  Defendant has advantages that many of the
6  defendants that this Court sees do not have: he has a loving family,
7  a stable support network, and an education.  He could have chosen to
8  use these advantages to obtain gainful employment and to serve as a
9  contributing member of society.  He chose not to do so.  The fact
10 that he has had steady employment in the last few years shows that he
11 had other options; he was not forced into a life of crime.  Defendant
12 chose to try to cheat the system, and for that he should be punished.
13 The USPO is recommending a below-guideline sentence in part because
14 of the advantages that defendant has over other defendants – because
15 he is educated, because he has not had other contacts with law
16 enforcement, and because he has been able to obtain and maintain
17 gainful employment.  However, the fact that he could have led a law-
18 abiding life and simply chose not to do so is another factor that
19 warrants a significant prison sentence.

20      Fourth, a guidelines sentence will avoid unwarranted sentencing
21 disparities.  See, e.g., United States v. Guerrero-Velasquez, 434
22 F.3d 1193, 1195 n.1 (9th Cir. 2006) (recognizing that the Guidelines
23 "help to maintain uniformity in sentencing throughout the country").
24 Another important sentencing consideration in this case is the fair
25 treatment of similarly situated defendants and the countervailing
26 concern that similarly situated defendants will receive different
27 sentences depending on where they are sentenced, or because of other
28 non-merit-based factors.  The other defendants who went to trial,

13

particularly defendant's brother and co-defendant Abaji, deserve lengthy prison sentences, and defendant should likewise receive a substantial prison sentence proportional to his management role in the fraud scheme; a guideline sentence ensures this outcome. Similarly, a guideline sentence will ensure that this defendant and other defendants in this district and in other parts of the country who commit similar crimes -- involving losses of $10 million or more -- will receive sentences that are proportional to the crimes that they commit, commensurate with their culpability, and similar to sentences of similarly situated defendants.

## IV.   RESTITUTION

In addition to the period of incarceration, defendant should be ordered to make full restitution to the victims of his crimes.  The Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A and § 3664, applies to "an offense against property under this title . . . including any offense committed by fraud or deceit."  18 U.S.C. § 3663A(c)(1)(A)(ii).  Under the MVRA, a district court must order restitution in such a case where "an identifiable victim or victims has suffered a . . . pecuniary loss."  18 U.S.C. § 3663A(c)(1)(B). With this statutory background, this Court is required to impose an order of restitution in this case in favor of the victims for the full amount of their losses, without consideration of the defendants' ability to pay that amount. 18 U.S.C. § 3664(f)(1)(A); USSG § 5E1.1 (directing the sentencing court to enter a restitution order if there is an identifiable victim).

As set forth in the PSR, defendant caused losses of $10,047,272 to the bank victims listed in the PSR, and in the amounts listed in

the PSR, and he should be ordered to pay restitution to those victims in the listed amounts.

**V.    CONCLUSION**

For the reasons set forth above, the government recommends that the Court order a prison term of 121 months, a 4-year term of supervised release, and a $400 special assessment, and that it issue a restitution order requiring payment of $10,047,272 from defendant in the amounts and to the victims listed in the PSR.

Dated: March 30, 2018          Respectfully submitted,

TRACY WILKISON
Attorney for the United States

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
KERRY L. QUINN
TERRENCE MANN
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA