CRAIG WILKE (150728)
craig@craigwilkelaw.com
305 N. Harbor Blvd., Suite 216
Fullerton, California 92832-1901
Telephone (714) 870-8900
Facsimile  (714) 879-2278

SHEILA MOJTEHEDI (313002)
sheila@mojtehedi.com
806 E. Avenida Pico, Ste I-291
San Clemente, CA 92673
Telephone (323) 412-0472
Facsimile   (323) 403-4170

Attorneys for Defendant
MAHER OBAGI

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MAHER OBAGI ,<br><br>Defendants. | Case No. 8:13-cr-00001-DOC<br><br>**DEFENDANT'S MOTION TO DISMISS SECOND SUPERSEDING INDICTMENT WITH PREJUDICE; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Hearing Date:  August 26, 2022<br>Hearing Time:  4:00 p.m. |

Defendant Maher Obagi, by and through his attorneys of record Craig Wilke and Sheila Mojtehedi, hereby moves to dismiss with prejudice the indictment as well as the

/

/

/

/

/

1

first and second superseding indictments. This motion is based on the attached memorandum of points and authorities and the files and records in this case.

                                                                Respectfully Submitted,

Dated:  August 25, 2022                            /s/
                                                     CRAIG WILKE
                                                     SHEILA MOJTEHEDI
                                                     Attorneys for Defendant Maher Obagi

**MEMORANDUM OF POINTS AND AUTHORITIES**

**INTRODUCTION**

Almost ten years after being indicted, defendant Maher Obagi now faces the prospect of a third trial on conspiracy and wire fraud charges based on events that occurred between late-2007 to mid-2009. In his first trial, the government violated Obagi's due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972), by failing to time disclose critical impeachment evidence. Recently, in his second trial, the government violated his confrontation rights under *Bruton v. United States*, 391 U.S. 123 (1968), by failing to properly redact a codefendant's recorded statement and translated transcript of the statement that the government introduced in its case-in-chief. In the interim, two witnesses have died and a third has become unavailable due to illness. And, with each new trial, the government refines its case to take advantage of information gleaned from the prior trial. The government's repeated violations of Obagi's constitutional rights over two trials, its misrepresentations to defense counsel and the Court about the redactions to the codefendant's statement, and its violation of the Court's order in this regard warrant dismissal of the indictment with prejudice.

**STATEMENT OF FACTS**

On January 3, 2013, the government filed an indictment charging Maher Obagi, Mohamed Salah and others with conspiracy to commit bank and wire fraud, and charging Maher Obagi and others with six counts of wire fraud. (ECF 1.) On January 9, 2013, the defendants were arraigned, pleaded not guilty, and the case was set for trial. The defendants were released on bond. Obagi's bond conditions include intensive supervision by the Pretrial Services Agency as well as restrictions on his travel and employment.

The charges against Obagi and Salah arise out of their employment with a group of companies that were owned and managed by Ali Khatib. (ECF 1: 2.) These companies included Excel Investments, Event Marketing LLC, Faris Realty and

3

Investment Group Inc., and Orange County Property Management Inc. (ECF 1: 2.) Obagi and Salah allegedly conspired with each other and others, including Khatib, Momoud Aref Abaji ("Aref Abaji"), Wajieh Tbakhi, Jacqueline Burchelle, and Mohamed El Tahir, to commit wire and bank fraud in violation of 18 U.S.C. § 1349. (ECF 1: 1-2, 4.)

The charged scheme allegedly sought "to defraud mortgage lenders . . . by inducing them to fund loans for the purchase of newly-built, multi-unit condominium properties by submitting false and fraudulent HUD-1 [settlement statements], loan applications, and supporting documents." (ECF 1: 3.) It was allegedly carried out as follows:

a. Aref Abaji and others identified newly-built condominium projects and arranged with builders to sell condominiums in exchange for a commission or marketing fee;

b. Aref Abaji, Maher Obagi, Tbakhi and others would purchase or cause the purchase of over 100 condiminiums for themselves, close relatives, and others with good credit scores who were recruited to serve as "straw buyers;"

c. Aref Abaji, Maher Obagi, Tbakhi and others purchased and recruited straw buyers to purchase the condominiums by offering them as an investment opportunity that did not require a down payment or mortgage payments for a period of time and by promising that they would manage the condominiums, rent the property and use the rental income to make mortgage payments;

d. Maher Obagi, Tbakhi, El Tahir, Salah and others would identify mortgage lenders and prepare loan applications for the buyers;

e. Maher Obagi, Tbakhi, El Tahir, Salah and others would prepare and submit loan applications that included false information about the buyer' intended occupance, employment, income, assets and liabilities;

f. Maher Obagi, Tbakhi, El Tahir, Salah and others would create fraudulent tax and employment documents to support the false loan applications;

4

    g. Maher Obagi, Tbakhi, Burchell, and others would false represent to mortgage lenders that buyers had made a down payment;

    h. Aref Abaji, Maher Obagi, Tbakhi, El Tahir, Salah and others would simultaneously submit loan applications and HUD-1 settlement statements to different mortgage lenders thereby concealing the buyer's multiple loan applications and liabilities;

    i. Aref Abaji, Burchell and others would concel significant "marketing fees" and commissions paid by sellers to the defendants and their coconspirators by preparing and submitting to lenders false HUD-1s; and

    j. Aref Abaji, Maher Obagi, Tbakhi, Burchell, Salah and others would distribute the funds paid as "marketing fees" among themselves.

(ECF 1: 3-6.)

On December 18, 2013, the Honorable Andrew Guilford, United States District Judge, granted a defense motion for a bill of particulars identifying all known coconspirators and coschemers. (ECF 111: 2; ECF 158). Meanwhile, the government filed a first superseding indictment which added tax evasion charges against Aref Abaji but did not otherwise affect the charges against Maher Obagi. (ECF 141.) Thereafter, the government filed bill of particulars and an under seal supplement to the bill of particulars that identified purported "straw buyers" Diana Harrison, Robert Dearstyne and John Shubash as coconspirators. (ECF 188: 2-3; *see also* ECF 155.) The bill of particulars as supplemented also identified escrow officer Hali Sadd as a coconspirator. (ECF 188: 3.)

Prior to trial, Obagi moved to sever pursuant to Fed. R. Crim. P. 14. (ECF 113.) Obagi contended that he would be prejudiced by a joint trial at which the government sought to introduce Salah's hearsay statements implicating him without an opportunity for cross examination. (ECF 113.) Alternatively, Obagi moved to exclude Salah's hearsay statements. (ECF 113.) The government opposed the requested severance and argued that Salah's recorded conversation with Ali Khatib on March 30, 2011, which

5

implicated Obagi could be redacted to adequately protect Obagi's confrontation rights. (ECF 129: 11, 14; ECF 129-1.) Judge Guilford denied Obagi's severance motion without prejudice. (ECF 158.)

In March 2015, the case proceeded to trial at which the government was represented by Assistant United States Attorney Kerry Quinn and Christopher Pelham. (ECF 242.) At trial, the government introduced Exhibit 122 which was an 11-page transcript of the March 30, 2011 recorded conversation between Salah and Khatib which had been translated from Arabic to English with all references in the transcript to Obagi redacted. Exhibit A attached hereto is a true and correct copy of Exhibit 122 which was admitted at the first trial. (Wilke Decl. ¶ 2.)

In the March 2015 trial, the government presented testimony from Khatib, El Tahir, Shubash, Dearstyne, Harrison and Saad. (Wilke Decl. ¶ 3.) Although the government had identified Shubash, Dearstyne, Harrison and Saad in the bill of particulars as coconspirators, government counsel presented their testimony as if they were unknowing and innocent participants in the charged scheme. In closing, the government argued that Shubash, Dearstyne and Harrison were simply "straw buyers" with high enough credit scores whom "the schemers found." (RT 3/24/15 72-73.) The government also argued that the jury should credit escrow officer Burchell's testimony about Obagi's participation in the scheme despite the substantial impeachment because the other escrow officer Saad was an "independent witness" who did not have an agreement with the government, and she corroborated Burchell. (RT 3/24/15: 79-84.)

After closing argument by Obagi's counsel, government counsel notified the Court that a colleague who had observed the closing arguments from the gallery notified them that Saad did, in fact, have an immunity agreement with the United States Attorney in this district and was cooperating in an unrelated mortgage fraud case. Characterizing the prosecutor's conduct as not "even … and oversight" and akin to "[j]ust two trains passing in the night that the other didn't know what the other was doing," Judge Guilford struck Saad's testimony and instructed the jury to disregard it.

6

After three days of deliberation, the jury found Obagi guilty of conspiracy and three wire fraud counts but was unable to reach a unanimous verdict on three other wire fraud counts. (ECF 256-258). Following trial, the government disclosed thousands of pages of additional discovery related to Saad and other witnesses in the case. (Wilke Decl. ¶ 4.) The defendant moved for dismissal of the indictment and presented evidence that case agent Heather Campbell's conduct which resulted in the *Brady* violation was reckless. (ECF 363, 367, 426, 428.) Judge Guilford denied the defense motion.

On appeal, the Ninth Circuit reversed the convictions of both Obagi and Salah. *United States v. Obagi*, 953 F.3d 993 (9th Cir. 2020) The Ninth Circuit held that the government violated the defendants' due process rights as recognized in *Brady* and *Giglio* by failing to timely disclose information about Saad's cooperation with the United States Attorney in the unrelated mortgage fraud case.[1] Although Saad's testimony did not implicate Salah, the Ninth Circuit found that he was prejudice because the government's failure to disclose this information impeached the thoroughness and objectivity of the government's investigation.

Following remand from the Ninth Circuit, the case was reassigned to this Court due to Judge Guilford's retirement. When defense counsel advised the government that the Model Ninth Circuit Instruction when the grand jury returned the first superseding indictment erroneously defined "intent to defraud," the government sought and obtained the second superseding indictment which is not materially different from the first superseding indictment. (ECF 763; *see also* Wilke Decl. ¶ 5.)

Once again, Obagi moved to sever from Salah. (ECF 773.) Obagi contended that the introduction of Salah's statements at a joint trial would prejudice him and, even if redacted to eliminate reference to him, and would give the government an impermissible windfall. (ECF 773: 6-7.) In opposing this motion, the government

---

[1] Obagi did not appeal the district court's denial of his motion to dismiss the indictment.

7

1 | made the following representation to the Court on June 6, 2022:

2 |     Similar to what happened in the first trial, the government has no intention
3 |     of introducing defendant OBAGI's statements as evidence against SALAH
4 |     or defendant SALAH's statements as evidence against OBAGI. To this
5 |     end, the agent witness summarizing defendant OBAGI's statements will
6 |     not include any mention on the statements OBGAI made incriminating
7 |     SALAH. Similarly, the agent witness summarizing defendant SALAH's
8 |     statements (who will be the same agent witness summarizing OBAGI's
9 |     statements) will not mention any of SALAH's statements incriminating
10 |     defendant OBAGI, *and the translation of his recorded call with KHATIB*
11 |     *will be redacted to the extent it includes statements that incriminate*
12 |     *OBAGI.*
13 | (ECF 782: 17 (emphasis added).) On June 28, 2022, The Court denied Obagi's
14 | severance motion. (ECF 806.) The Court ordered the government to file its proposed
15 | redactions to Salah's statements and ordered Obagi to file any objections to these
16 | redactions.
17 |     On July 22, 2022, the government lodged its proposed *Bruton* redactions. (ECF
18 | 810.) In doing so, the government made the following representations to the Court:
19 |     For defendant Salah's recorded statements, the government intends to
20 |     admit the translated transcript of the statements . . . with the government
21 |     publishing the translation while the recording is played during this
22 |     witness's testimony. The translated transcript of defendant Salah's
23 |     recorded statements is attached as Exhibit C, with the government's
24 |     proposed *Bruton* redactions noted through red boxes surrounding the
25 |     proposed redactions; the redactions will be noted as black or grey box
26 |     redactions in the exhibit the government seeks to introduce, and the
27 |     redacted portions will also be omitted from the audio tape.
28 | (ECF 810: 2.) Exhibit B attached hereto is a true and correct copy of the proposed

redactions to the March 30, 2011, recorded Arabic conversation between Salah and Khatib that the government filed on July 22, 2022. (Wilke Decl. ___.) Despite its representation to the Court, the government failed to redact the following passage which implicates Obagi:

> AK: But they took it.
> took everything from her."
>
> MS: Ah! Mahir took everything from her!
>
> AK: In other words, you were not with them when it was…. I heard that they were saying that *they were shredding the papers and they destroyed* the-the-*the server and the hard drive. They destroyed them and-and-and* I don't know… *they destroyed the whole comp… all the computers*. You were not with them during those days?
>
> MS: No, no.
>
> AK: They allowed you to leave… you left along with Ha… with-with [UI] [OV] Christina--
>
> MS: Me and Hajjah left [UI]
>
> AK: --and they--and they finished the matter. You don't know about this subject?
>
> MS: No, this one--this one, I don't know. In other words, I remember that there was so much. I told them no. They were saying…. I mean they were saying, "What are we going to do with the documents and with all of the other items?" I told them… I told them, "Talk to… talk to… I mean… let us take the items and deliver them… I mean… to the house at Uncle Ali's, for example, if the office is not safe or something." After that, they told me no. He told me, "That is it, you go ahead and--"
>
> AK: [UI] He stayed--he stayed; only he and his brother stayed at the-at the office.

9

> MS: Yes, 'Arif and what is his name, Mahir stayed a little longer in the office, and then that was it. Afterwards, I was [UI] by God, I was working on that day. I remember the day; by God, it was-it was a Friday. I remember, it was the last day, by God, it was Friday.

(Ex. B-9.) Obagi objected to two statements by Salah in which he used the term "we" to describe who created of fraudulent employment and tax documents but did not object to the above-quoted passage. (ECF 818: 13). In ruling on Obagi's objections, the Court stated as follows:

> The Government can only redact names or clearly identifying information; they cannot change the content of the statements. The Government can 1) not use a statement; 2) instead of identifying people as "they" or generic groups, the Government can use "person 1, person 2, person 3, etc." to address Defense's concerns over specificity; or 3) they can sever the trial. For example, in statement O-1, the Government may redact so that it reads: "Person 1 and Person 2 were in charge of the phones."

(ECF 829: 2.)

On Friday, August 19, 2022, the government disclosed its trial exhibits to Obagi including Exhibit 122 which is the redacted transcript and translation of the March 30, 2011 conversation between Salah and Khatib in Arabic. Exhibit C is a true and correct copy of Trial Exhibit 122 that was produced to defense counsel on August 19, 2022, and incorporates the redactions proposed by the government on July 22, 2022. (Wilke Decl. ¶ 6).

On August 22, 2022, the jury was empaneled and sworn. On the second day of trial, the government presented the testimony of retired FBI Agent Mark Matthews. Matthews testified about an unrecorded January 2012 interview of Obagi, and Matthews he attributed several statements to Obagi during the interview admitting to his participation in multiple aspects of the charged scheme. Matthews also testified about an unrecorded interview of Salah in which Salah also admitted to some of the

same aspects of the scheme in terms virtually identical to the terms that Matthews attributed to Obagi.

By the end of the second day of trial, the government was still on direct examination of Matthews and advised the court that it would require additional time to complete his direct examination. The Court recessed for the day. Defense counsel told government counsel that he intended to introduce loan documents through Matthews that were not the subject of direct examination. Defense counsel asked whether the government objected to questioning Matthews about these matters on cross-examination or whether the defense would need to recall Matthews in the defense case-in-chief. In response to government counsel's question about the additional loan documents, defense counsel gave government counsel four binders of defense exhibits marked at Exhibits 1001-1600 and directed her to the specific loan documents that the defense would seek to introduce through Matthews. Government counsel advised defense counsel that she did not object to introducing these additional loan documents during the cross-examination of Matthews. This agreement between counsel was put on the record in court. (Wilke Decl. ¶ 7.)

On the morning of the third day of trial, the government introduced the recording of the March 30, 2011 Arabic-language conversation between Salah and Khatib. The government played the recording in court while a rolling English-translated transcript was presented on the video monitors in the courtroom. The government also gave each juror a paper copy of the English-translate transcript. The Court advised the jury that, because the conversation was in Arabic, the transcript was the evidence. While the recording was being played for the jury, government counsel realized that the above-reference excerpt of the conversation should have been redacted. However, government counsel did not immediately bring the matter to the attention of the Court or defense counsel because, as later represented to the Court, she did not want to bring attention to matter before the jury. Government counsel concluded her direct examination and still

11

1  did not bring the matter to the attention of the Court or defense counsel. (Wilke Decl. ¶
2  8.)
3       Defense counsel began his cross examination of Matthews. During this cross
4  examination, defense counsel elicited that, in addition to the report of his 2012
5  interview of Obagi about which he was testifying, government counsel had provided
6  Matthews with other case materials including reports or interviews with Khatib and
7  other witnesses. During cross examination, defense counsel also introduced records of a
8  fraudulent mortgage loan in Obagi was a straw purchaser for a condominium in Fort
9  Meyers, Florida, that was sold for $378,000 and financed with a $359,100 loan, and for
10 which Chin Construction, which was a company associated with Khatib, received
11 $141,750 at closing. Defense counsel questioned Mathews about Obagi's purported
12 signatures on the loan application and supporting letter which appear to be forged, and
13 for which Obagi had given notice to the government of his intent to introduce expert
14 opinion testimony from a forensic document examiner. Defense counsel questioned
15 Matthews about Obagi's purchase of three condominiums in Northern California
16 shortly after the Florida condomium was sold. Defense counsel introduced loan
17 documents showing that Obagi paid $199,000 each for two condominiums with an
18 actual value of $84,000 each, and paid $225,000 for a third condominium with an
19 actual value of $101,000. Documents marked as defense exhibits and which defense
20 counsel had already produced to the government would show that, despite paying
21 $623,000 for three condominiums with an actual value of $269,000, Obagi was
22 continuing to make his monthly loan payments on the condominiums when he was
23 interviewed by the FBI in January 2012. (Wilke Decl. ¶ 9.)
24      At a recess, government counsel notified defense counsel that the recording of
25 the March 30, 2011 conversation between Salah and Khatib contained the above-quoted
26 passage which should have been redacted. Government counsel also advised defense
27 counsel that the rolling transcript that was displayed on the courtroom monitors as well
28 as the paper copy of each transcript that was given to each juror (with an instruction

that it was the evidence due to the conversation being in Arabic) also contained the above-quoted passage which should have been redact. The Court granted Obagi's motion for a mistrial and ordered him to file a brief by 12:00 noon the following day addressing whether the indictment should be dismissed with prejudice. (Wilke Decl. ¶ 10.)

## ARGUMENT

### 1. The Court should dismiss the indictment in the exercise of its supervisory power.

In *Berger v. United States*, 295 U.S. 78 (1935), the Supreme Court reversed the defendant's conviction for conspiring to possess counterfeit notes due to prosecutorial misconduct during trial. The misconduct consisted of misstating the facts in his cross-examination of witnesses, putting words into the mouths of witnesses, bullying witnesses "and, in general, of conducting himself in a thoroughly indecorous and improper manner." *Id*. at 84. Although the trial judge sustained objections and instructed the jury to disregard certain questions and testimony, the Supreme Court concluded that it was "impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken." *Id*. at 85.

The Supreme Court went on to promulgate a standard for prosecutive conduct that remains in place:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done ... He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones ... In these circumstances prejudice to the cause of the accused is so highly probable that we are not justified in assuming its nonexistence.

13

*Id*. at 88-89. In applying *Berger*, the Ninth Circuit later summarized the point succinctly: "The prosecutor's job isn't just to win, but to win fairly, staying well within the rules." *See United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir.1993).

In *United States v. Chapman*, 574 F.3d 1078 (9th Cir. 2008), the Ninth Circuit affirmed the district court's dismissal of an indictment mid-trial. The court recorgnied that a district court may dismiss an indictment for outrageous government conduct if the conduct amounts to a due process violation. The court also recognized that, even if the conduct does not rise to the level of due process violation, the district court may dismiss under its supervisory power. *Id.* at 1084. The Ninth Circuit has held that a district court may exercise is supervisory power "to implement a remedy for a violation of a recognized statutory or constitutional right; to preserve judicial integrity b ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *United States v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991). The court later clarified that the exercise of a district courts inherent powers are not limited to these three grounds. *United States v. W.R. Grace*, 526 F.3d 499, 511 n.9 (9th Cir. 1991). And, in *Kojayan*, the Ninth Circuit held that "the judiciary – especially the court before which the primary evidence took place – may exercise its supervisory power to make clear that the misconduct was serious … and that steps must be taken to avoid a recurrence." *Kojayan*, 8 F.3d at 1325; *see also United States v. Aguilar*, 831 F. Supp. 2d 1180, 1206-07 (C.D. Cal. 2011) (discussing court's authority to dismiss indictment).

The Court should dismiss the indictment in this case due to the government's repeated violations of Obagi's constitutional rights, misrepresenations to defense counsel and the court about what it was placing before the jury in the recent trial, and violation of the court's order to properly redacted references to Obagi from Salah's statement before presenting it to the jury. Remarkably, government counsel was aware of the *Bruton* violation as it was happening in court but said nothing. Although the Court granted a mistrial, Obagi would be prejudice by having to face trial for the third

time because the government learned of the defense theory and received the defense impeachment exhibits after becoming aware of the *Bruton* violation.

The government already exploited its *Brady* violation at the first trial. After hearing the defense cross examination and evidence in 2015, it prepared its witnesses for the second trial knowing the cross examination. Indeed, after hearing the testimony of Khatib and Harrison at the first trial, the government decided not to call either witness at the second trial. Obagi is further prejudiced by the unavailability of Dearstyne and Shubah. Despite identifying them in its bill of particulars as coconspirators, the government presented them as secondary victims at the first trial who were used as straw buyers to generate large fees and commission for the defendants. Maher Obagi's defense is that, like Dearstyne and Shubash, he too was victimized by Khatib, Tbakhi and Aref Abaji; and the presentation of their former testimony in lieu of live testimony prejudices Obagi.

**2.     The Court should dismiss the indictment to protect Obagi's double jeopardy right.**

"One of the principal threads making up the protection embodied in the Double Jeopardy Clause is the right of the defendant to have his trial completed before the first jury empaneled to try him." *Oregon v. Kentucky*, 456 U.S. 667, 673 (1982). Still, where the first trial is terminated due to a successful defense motion for a mistrial, double jeopardy is no bar to retrial. *Id*. However, as the Supreme Court has recognized that "there would be great difficulty in applying such a rule where the prosecutor's actions giving rise to the motion for mistrial were done in order to goad the defendant into requesting a mistrial." *Id*. (internal quotation marks and citations omitted).  Therefore, the Supreme Court reached the following compromise:

> We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial.  But we do hold that the circumstances under which such a defendant may invoke the bar

of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

*Id*. at 679.

The double jeopardy clause bars retrials where bad-faith conduct by prosecutor "threatens the [h]arassment of an accused by successive prosecutions ... so as to afford the prosecution a more favorable opportunity to convict the defendant." *United States v. Dinitz*, 424 U.S. 600, 611 (1976) (citation and internal quotations omitted).

A prosecutor's intent to "goad" the defense into seeking a mistrial may be inferred "from objective facts and circumstances ...." *Oregon v. Kentucky*, 456 U.S. at 675; *see also id*. at 679-80 (Kennedy, J., concurring) (court should rely primarily upon "objective facts and circumstances of the particular case" to discern the prosecutor's intention). Intent may be inferred from a prosecutor's "sequence of overreaching" in pretrial and trial proceedings. *Id*. at 680 (Powell, J., concurring). "The more egregious the prosecutorial error, and the harsher its impact on the defendant, the more readily the inference could be drawn." *Id*. at 690 n.29 (Stevens, J., concurring). Gross negligence by the prosecutor may support an inference that she intended to goad defense counsel to move for a mistrial. *United States v. Serra*, 882 F.2d 471, 473 (11th Cir. 1989). Because the inquiry is an objective one, an evidentiary hearing is not required to determine whether the prosecutor subjectively intended to goad defense counsel into seeking a mistrial. *United States v. Roberts*, 640 F.2d 225, 228 (9th Cir. 1981); *United States v. Calderon*, 618 F.2d 88, 89-90 (9th Cir. 1980).

The objective circumstances of this case support the inference that the prosecutor intended to goad defense counsel into seeking a mistrial. The prosecutor represented to the Court and defense counsel that Salah's statement would be redacted to eliminate all references to Obagi, yet placed an evidentiary transcript in front of the jury which directly implicated Obagi in the fraudulent scheme. The prosecutor realized that she had done so while the recording was being presented to the jury but failed to

16

immediately bring the matter to the attention of the Court and defense counsel, failed to advise the Court of the matter even after the Court instructed the jury that the transcript of the translation conversation – a copy of which was in the hands of each juror – was the evidence. The prosecutor concluded her direct examination of Matthews and still did not bring the matter to the attention of defense counsel or the Court. Only after several hours of hearing defense counsel's cross-examination of Matthews, who is one of the key primary witnesses in the government's case against Obagi, and understanding for the first time Obagi's theory of defense and the evidence he would introduce to prove it, the prosecutor brought the *Bruton* violation to the attention of the Court and defense counsel. These circumstances objectively support the inference that the prosecutor intended to goad defense counsel into seeking a mistrial.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the indictment, the first superseding indictment, and the second superseding indictment with prejudice as to defendant Maher Obagi.

Respectfully Submitted,

Dated:  August 25, 2022                    /s/
CRAIG WILKE
SHEILA MOJTEHEDI
Attorneys for Defendant Maher Obagi

17

# DECLARATION OF CRAIG WILKE

I, Craig Wilke, hereby state and declare the following:

1. I am counsel for Maher Obagi.

2. Exhibit A attached hereto is a true and correct copy of Exhibit 122 which was admitted at the first trial.

3. In the March 2015 trial, the government presented testimony from Khatib, El Tahir, Shubash, Dearstyne, Harrison and Saad.

4. Following trial, the government disclosed thousands of pages of additional discovery related to Saad and other witnesses in the case.

5. After remand from the Ninth Circuit, when I advised the government that the Model Ninth Circuit Instruction when the grand jury returned the first superseding indictment erroneously defined "intent to defraud," the government sought and obtained the second superseding indictment which is not materially different from the first superseding indictment.

6. On Friday, August 19, 2022, the government disclosed its trial exhibits to Obagi including Exhibit 122 which is the redacted transcript and translation of the March 30, 2011 conversation between Salah and Khatib in Arabic. Exhibit C is a true and correct copy of Trial Exhibit 122 that was produced to defense counsel on August 19, 2022, and incorporates the redactions proposed by the government on July 22, 2022.

7. By the end of the second day of trial, the government was still on direct examination of Matthews and advised the court that it would require additional time to complete his direct examination. The Court recessed for the day. I told government counsel that I intended to introduce loan documents through Matthews that were not the subject of direct examination. I asked whether the government objected to questioning Matthews about these matters on cross-examination or whether I would need to recall Matthews in the defense case-in-chief. In response to government counsel's question about the additional loan documents, I gave government counsel four binders of

1 defense exhibits marked at Exhibits 1001-1600 and directed her to the specific loan
2 documents that the defense would seek to introduce through Matthews. Government
3 counsel advised me that she did not object to introducing these additional loan
4 documents during the cross-examination of Matthews. This agreement between counsel
5 was put on the record in court.

6     8.    On the morning of the third day of trial, the government introduced the
7 recording of the March 30, 2011 Arabic-language conversation between Salah and
8 Khatib. The government played the recording in court while a rolling English-translated
9 transcript was presented on the video monitors in the courtroom. The government also
10 gave each juror a paper copy of the English-translate transcript. The Court advised the
11 jury that, because the conversation was in Arabic, the transcript was the evidence.
12 While the recording was being played for the jury, government counsel realized that the
13 above-reference excerpt of the conversation should have been redacted. However,
14 government counsel did not immediately bring the matter to the attention of the Court
15 or defense counsel because, as later represented to the Court, she did not want to bring
16 attention to matter before the jury. Government counsel concluded her direct
17 examination and still did not bring the matter to the attention of the Court or defense
18 counsel.

19     9.    I began my cross examination of Matthews. During this cross examination,
20 I elicited that, in addition to the report of his 2012 interview of Obagi about which he
21 was testifying, government counsel had provided Matthews with other case materials
22 including reports or interviews with Khatib and other witnesses. During cross
23 examination, I also introduced records of a fraudulent mortgage loan in Obagi was a
24 straw purchaser for a condominium in Fort Meyers, Florida, that was sold for $378,000
25 and financed with a $359,100 loan, and for which Chin Construction, which was a
26 company associated with Khatib, received $141,750 at closing. I questioned Mathews
27 about Obagi's purported signatures on the loan application and supporting letter which
28 appear to be forged, and for which Obagi had given notice to the government of his

19

intent to introduce expert opinion testimony from a forensic document examiner. Defense counsel questioned Matthews about Obagi's purchase of three condominiums in Northern California shortly after the Florida condomium was sold. Defense counsel introduced loan documents showing that Obagi paid $199,000 each for two condominiums with an actual value of $84,000 each, and paid $225,000 for a third condominium with an actual value of $101,000. Documents marked as defense exhibits and which I had already produced to the government would show that, despite paying $623,000 for three condominiums with an actual value of $269,000, Obagi was continuing to make his monthly loan payments on the condominiums when he was interviewed by the FBI in January 2012.

10.   At a recess, government counsel notified me that the recording of the March 30, 2011 conversation between Salah and Khatib contained the above-quoted passage which should have been redacted. Government counsel also advised me that the rolling transcript that was displayed on the courtroom monitors as well as the paper copy of each transcript that was given to each juror (with an instruction that it was the evidence due to the conversation being in Arabic) also contained the above-quoted passage which should have been redact. The Court granted my motion for a mistrial and ordered me to file a brief by 12:00 noon the following day addressing whether the indictment should be dismissed with prejudice.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on August 25, 2022, at Fullerton, California.

/s/
CRAIG WILKE